## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

FAUSTINE KIWIA                                    CIVIL ACTION

VERSUS                                            NO. 20-96

M/V OSLO BULK 9 ET AL                             SECTION: "H"

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action arises out of personal injuries sustained by Plaintiff, Faustine Kiwia, while working as a stevedore for Coastal Cargo Co., LLC ("Coastal Cargo") aboard the M/V OSLO BULK 9 ("the Oslo Bulk"). Plaintiff asserts that the ship's owner and operator, Oslo Bulk Beta AS and Bulkship Management AS ("Defendants"), are liable for his injuries under 33 U.S.C. § 905(b) of the Longshore and Harbor Worker's Compensation Act ("LHWCA"). This action went to trial on March 15 through 16, 2021. Having considered the evidence admitted at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, and vice versa, the Court adopts it as such.

## FINDINGS OF FACT

1.   Plaintiff Faustine Kiwia is 43 years old. He was born in Tanzania and arrived in the United States in 2008. After arriving in the United States and before his employment with Coastal Cargo, Kiwia worked as a hotel clerk for one year and then as a cashier at several convenience stores. Kiwia was never terminated from any of his

1

previous positions and left each position for another with higher pay and greater security.

2.  Kiwia was hired by Coastal Cargo, a stevedoring company, on February 19, 2019 to work as a laborer. Kiwia had no prior experience as a stevedore but intended for this to be a permanent job position. He hoped to one day become a crane operator.

3.  Coastal Cargo hired Kiwia the same day he applied. After he was hired, Kiwia spent the rest of the day undergoing safety training in a classroom setting. Thereafter, Kiwia was to receive "on the job" training.

4.  At the time Kiwia was hired by Coastal Cargo, his rate of pay was $11.50 per hour.

5.  At the relevant time, the Oslo Bulk was in the Mississippi River at the Port of New Orleans. The Oslo Bulk is an oceangoing cargo ship with large cargo holds in the center of the ship. There is a raised steel "wall" or "coaming" on the vessel's deck around each of the cargo holds. At the top of each coaming, there is a railing or track upon which the mechanically operated cargo hatch covers roll open and closed on large steel wheels. Several witnesses described the hatch covers on the Oslo Bulk as "accordion-style," where the cover splits in two and folds up on each side of the cargo hatch. The deck of the Oslo Bulk also contains a narrow walkway that lays between the coaming wall and the ship's outer railings.

6.  On March 1, 2019, Kiwia arrived at the Coastal Cargo office at 6:30 a.m. and was assigned to work with the Coastal Cargo crew responsible for offloading cargo from the Oslo Bulk onto a barge. The

2

crew held a "gangway safety meeting" at 10:00 a.m. and began working on the vessel and barge around 12:00 p.m.

7.  On this day, Kiwia worked primarily on the barge onto which the vessel's cargo was loaded. The barge was located adjacent to the ship.

8.  Around 2:45 p.m., it began to rain lightly, and the Coastal Cargo crewmembers were instructed to return to the dock for a lunch break.

9.  To access the dock from the barge, the crewmembers had to climb a "Jacobs ladder" that hung off the side of the Oslo Bulk. The Jacobs ladder is tied to the top hand railing of the ship. After climbing up the ladder and over the railing, the crew then had to traverse the deck of the vessel to reach the dock. Kiwia was the third or fourth person from his crew to leave the barge for lunch.

10. After Kiwia reached the top of the Jacobs ladder, he placed his right hand on top of the hatch coaming for balance as he jumped down to the walkway on the deck of the vessel. Kiwia had placed at least one foot on the deck of the vessel with the intent to turn towards the right and head towards the dock. However, in that same moment, a crewmember to Kiwia's left called out for him, and Kiwia turned his body towards the left to walk towards his crewmember. Kiwia kept his right hand on the hatch coaming for balance as the deck was wet. Before Kiwia could take a step to the left, the closing hatch cover rolled over his hand. The steel wheels of the hatch cover cut through Kiwia's work gloves and severed the three middle fingers on his dominant right hand. After the cover rolled over Kiwia's fingers, Roy Hughes, Jr., a fellow Coastal Cargo crewman, yelled out to the Oslo Bulk crewmember in charge of the hatch cover's operating panel to

stop the cargo hatch cover. Kiwia then ripped his hand from the machine.

11. At all relevant times, the hatch cover was within the sole control of the Oslo Bulk's crew. The panel to operate the hatch cover was on the opposite side of the cargo hold from where the Coastal Cargo crew first accessed the deck after climbing the Jacobs ladder. Kiwia was not visible to the Oslo Bulk crewmember operating the panel.

12. The Court found the testimony of Roy Hughes, Jr. highly credible. Hughes has approximately twenty years of experience as a stevedore or longshoreman. Hughes worked for Coastal Cargo as a longshoreman and crane operator for three years. Hughes had no personal relationship with Kiwia prior to or following the accident and is no longer employed with Coastal Cargo. At the time of the accident, Hughes had met Kiwia only once or twice. At the time of trial, Hughes had not met with any attorneys in relation to this matter and was compelled to testify by subpoena.

13. On the day of the incident, Hughes was assigned to the same crew as Kiwia and was working for Coastal Cargo as a flagman. Hughes was standing on the deck of the vessel, approximately ten feet away from Kiwia, when Kiwia's hand was crushed.

14. There is some discrepancy between the testimonies of Hughes and Kiwia as to Kiwia's location at the time Kiwia's fingers were crushed. Kiwia testified that, at that moment, he had at least one foot on the deck of the vessel and was responding to a call from his left. Hughes testified that, at that moment, Kiwia was in the process of jumping to the deck from the Jacobs ladder and his feet had not yet hit the deck. Although the Court credits Kiwia's recitation of this moment over

that of Hughes, the Court finds the discrepancy in testimony immaterial. Both Kiwia and Hughes emphasized how quickly Kiwia's hand was crushed after he placed his hand on the railing. Considering both testimonies, the Court finds that no more than seconds passed between the time Kiwia first put his hand on the hatch coaming's railing to the time when his fingers were crushed.

15. Hughes testified that, because of the narrowness of the Oslo Bulk's walkway between the hatch coaming and the ship's railing, it was common practice for crewmembers to use the hatch coaming to steady themselves as they climbed over the railing from the Jacobs ladder. Hughes testified that he, as an experienced stevedore, would have also placed his hand on the hatch coaming to assist him in climbing from the ladder to the deck.

16. At the time Kiwia's fingers were crushed, it had begun to rain lightly. It is a common practice for cargo vessels to cover the cargo when it begins to rain. Despite the rain, however, an experienced stevedore would have expected some warning prior to the hatch's closure.

17. At the time Kiwia's fingers were crushed, there had been no warning to alert nearby longshoremen or seamen of the hatch's closure.

18. Hughes testified that, in his twenty years of experience as a stevedore, he has witnessed a hatch closing without warning only once or twice.

19. The Oslo Bulk's hatch cover was imperceptibly quiet and moved very slowly, such that those not paying attention to the hatch cover would not have noticed its closing without some warning. Hughes testified that, in this instance, the hatch cover's closing was particularly unexpected as men were still working in the cargo hold and were not

5

given an opportunity to climb out of the hold before the closure. Indeed, Hughes testified that the unexpected closure crushed his own bag that was set atop the hatch coaming.

20. The Court found Plaintiff's expert, Commander Don Green, credible as to his testimony that the Oslo Bulk's hatch cover operator had a duty of "situational awareness," or a duty to be aware of individuals or items in the vicinity of the closing hatch cover, and that the hatch cover operator's lack of situational awareness in this instance was a contributing cause of Kiwia's injuries. The Court did not find credible Commander Green's testimony as to the frequency of automatic hatch cover alarms on vessels.

21. The Court did not find credible the testimony of Jeremy Galliano as to the frequency of warnings prior to hatch cover closings. Galliano had limited experience working on vessels and primarily held managerial or administrative positions with Coastal Cargo.

22. The Court found Captain Keith Dean, an expert in marine safety including stevedoring and cargo operations, to be credible as to the standard safety practices on cargo vessels such as the Oslo Bulk. Captain Dean testified that alarms or sirens indicating the closure of hatch covers on bulk cargo ships are uncommon but that most hatch covers make significant noise while closing. Captain Dean also testified that the Oslo Bulk crewmember operating the hatch cover should have ensured that the coamings were clear before initiating the hatch's closing. Captain Dean added that an employee's bag resting on the hatch coaming is an item that would have been moved in such an inspection, as it could pose danger to the hatch cover machinery. The Court finds that Captain Dean's testimony

6

corroborated Commander Green's testimony as to "situational awareness." Captain Dean further testified that it is standard practice for the ship's crew to have a conversation with the stevedores' foreman or supervisor to discuss the closing of the hatch before initiating closure.

23. Although the Court finds credible Captain Dean's testimony as to standard safety practices on bulk cargo ships, the Court does not find credible Captain Dean's ultimate opinion that such standards were met in this case. Captain Dean's opinion relies on two unsupported assumptions. First, Captain Dean assumed that a conversation took place between a Coastal Cargo foreman or supervisor and the Oslo Bulk's crew regarding the closing of the hatch cover simply because it is a conversation that, in his experience, should take place. Second, Captain Dean assumed that the Oslo Bulk crewmember performed an inspection of the hatch coaming by walking around it before closing the hatch cover because it is standard in the industry and the crewmember "would get fired" if he did not. However, neither Captain Dean nor the Court was presented with any evidence that such a conversation or inspection took place, or of any disciplinary action taken or not taken by the Oslo Bulk following the incident. To the contrary, Captain Dean's assumptions are contradicted by Hughes's credible testimony that the hatch cover crushed his bag atop the hatch coaming and that longshoremen were still working in the cargo hold at the time of the unexpected closure.

24. Considering the credible testimonies of Hughes and Captain Dean as to the frequency of warnings on cargo ships signaling the closure of hatch covers, the Court finds that sirens or alarms are rare additions

to vessels but that verbal warnings are consistently given to stevedores. An experienced stevedore would have expected a warning before the hatch cover's closure.

25. Before closing the hatch cover, the exercise of reasonable care mandated that the relevant Oslo Bulk crewmember warn the Coastal Cargo supervisor or foreman and survey the vicinity of the hatch coaming to ensure that no individuals or objects were in the path of the closing cover. Here, the Oslo Bulk crew failed to warn a Coastal Cargo representative and survey the area surrounding the hatch coaming before closing the hatch. This failure was a contributing cause of Kiwia's injuries and constitutes a breach of the active control duty under *Scindia Stream Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981).

26. Defendants are 50% at fault for Kiwia's injuries.

27. Coastal Cargo's failure to properly train Kiwia as to the dangers of placing his hand on the hatch coaming is an additional cause of Kiwia's injuries. Coastal Cargo employee, Darnell Davis, testified that Kiwia should have received "on the job" training.  After ten days of work for Coastal Cargo, Kiwia had not yet been informed of the dangers associated with the closing hatch cover. Coastal Cargo employee Darnell Davis testified that more experienced longshoremen should have informed Kiwia, a trainee, of the danger posed by the hatch cover. Kiwia was clearly not taught about the hatch cover in his training as he was still unable to identify a hatch coaming at trial. Hughes also conceded that, although it was common practice for longshoremen to place their hands on the hatch coaming's

railing for balance, it would be prudent policy for Coastal Cargo to train new hires as to the dangers of doing so.

28. Coastal Cargo's representative testified that Kiwia was to receive "on the job" training. However, there is no evidence that anyone was assigned to train Kiwia or that anyone accepted responsibility for his training.

29. The Court finds Coastal Cargo 50% at fault.

30. Despite his inexperience, Kiwia would have responded appropriately to a warning to keep away from the hatch coaming.

31. Given Kiwia's lack of knowledge on the dangers of the hatch coaming cover, Kiwia acted reasonably in placing his hand on the hatch coaming to climb down from the ladder as he simply copied the more experienced longshoremen before him. To the extent that Kiwia allowed his hand to linger on the hatch coaming for an extra second while he gained his balance on the wet deck of the vessel, the Court finds that this action was not unreasonable.

32. Kiwia is not at fault for his injuries.

33. There is no evidence that a member of the Oslo Bulk crew witnessed members of the Coastal Cargo crew placing their hands on the hatch coaming. The Court therefore does not find that the Oslo Bulk crew breached the *Scindia* duty to intervene.

34. Kiwia has suffered significant emotional and physical injuries as a result of the accident.

35. The Court found credible the testimony of Dr. Charles Tuggle. Dr. Tuggle testified as an expert in plastic and reconstructive surgery and hand surgery and also as Kiwia's treating physician and surgeon at University Medical Center. Dr. Tuggle first saw Kiwia in the

9

emergency department of University Medical Center on the day he sustained his injuries, March 1, 2019. Dr. Tuggle described Kiwia's injuries on his right index, middle, and ring fingers as a "crush or evulsion," meaning that the fingers were not lacerated or cleanly severed. At the time of Dr. Tuggle's initial evaluation of Kiwia, Kiwia's index and middle fingers were completely amputated and he retained only a small portion of bone above the middle joint, or proximal interphalangeal joint, on his ring finger. Although Kiwia's severed index finger was brought with him to the hospital, Dr. Tuggle determined that it was not salvageable due to nature of his injuries.

36. Within several hours of Kiwia's admittance to University Medical Center, Dr. Tuggle performed surgery on Kiwia to clean and close his wounds. Kiwia was discharged from the hospital the following day and given medication to monitor his pain. Thereafter, Kiwia began physical therapy to preserve motion in his remaining digits. A few months after surgery, however, Kiwia began having pain in his index finger, which was later diagnosed as a symptomatic neuroma, or "scar ball" at the end of the transected nerve that is hypersensitive to touch. Desensitization therapy was attempted to address the symptomatic neuroma, but it was unsuccessful.

37. On July 4, 2019, Dr. Tuggle performed surgery on Kiwia's index finger to address the symptomatic neuroma. The surgery included neuroma management with a nerve to nowhere repair using an allograft—the grafting of a cadaver nerve to the existing nerve end—and webspace deepening—the rearranging of tissue to lengthen the existing stub. The surgery was moderately successful and diminished the nerve-related pain in Kiwia's index finger.

38.   After he recovered from his second surgery, Kiwia was referred to the amputee clinic and fitted for a prosthetic for his middle and index fingers. Dr. Tuggle explained that the body-powered, mechanical prosthetic allows Kiwia to grasp things such as coke bottles and door handles. Kiwia, however, testified that the prosthetic is of limited utility, as it is not very strong and does not allow him to hold more than two or three pounds.

39.   Kiwia does not have a prosthetic for his ring finger, but Dr. Tuggle recently provided him with another referral back to the amputee clinic to discuss the possibility of an additional prosthetic for the ring finger.

40.   Dr. Tuggle testified that, in the future, Kiwia may benefit from additional occupational therapy. Although there is the possibility for additional surgeries in Kiwia's future, no additional surgery is necessary at this time. Kiwia may still suffer from "phantom pain" common amongst amputees. Dr. Tuggle testified, however, that Kiwia did not complain to him of much pain in their last visit in February of 2021.

41.   Kiwia testified that he still suffers significant pain in his right hand, particularly in his index finger. He rated his pain a 3 or 4 out of 10.

42.   The Court found Dr. Beverly Howze, Plaintiff's treating psychologist and an expert in the field of clinical psychology with expertise in post-traumatic stress disorder ("PTSD"), credible as to her testimony about the psychological and emotional impact of Kiwia's injuries. Dr. Howze treated Kiwia consistently in the year following the accident.

43.   Dr. Howze described Kiwia as a rather "stoic" individual who has difficulty discussing personal matters and tends to understate the

significance of his own physical and emotional pain. Dr. Howze opined that Kiwia's impassiveness was largely attributable to Tanzanian cultural norms that discourage vulnerability.

44.   Dr. Howze testified that Kiwia suffered from many symptoms of PTSD, including nightmares, avoidance, hyperarousal, anxiety, erectile dysfunction, and depression. Kiwia struggles to reconcile his future plans with the reality of his newly limited capabilities. His PTSD is triggered, in part, by the sounds of machinery. Kiwia scores very low in reading comprehension, leading Dr. Howze to suspect a learning disability. At the time of Dr. Howze's last treatment with Plaintiff, she found that his prognosis was fair but limited by his learning abilities and his difficulty addressing the emotional impact of his injuries.

45.   The Court finds that Kiwia's testimony confirms Dr. Howze's assessment. Although Kiwia was pleasantly optimistic about his future, it is clear to the Court that Kiwia has experienced, and continues to experience, chronic physical and emotional pain as a result of his accident. Kiwia struggled to discuss the details of the accident and his life thereafter, but he did briefly comment that his injuries have negatively impacted his relationship with his wife and that he struggles with low libido. He also testified that he has trouble sleeping from the pain in his hand and struggles with "a lot of depression" and stress. He testified that he now feels "weak" and "different."

46.   The Court finds that Kiwia continues to suffer from PTSD and will require further psychological treatment.

12

47.  Writing and typing are difficult tasks for Kiwia given the loss of fingers on his dominant hand. Kiwia was able to write a narrative of his accident as part of his treatment with Dr. Howze, but it took him multiple days to complete.

48.  The parties stipulated to the use of reports in lieu of live testimony for their vocational and economic experts. The Court was thus presented with only the reports for vocational experts Nancy Favaloro and Thomas Meunier and economists Dr. Kenneth G. Boudreaux and Dr. G. Randolph Rice.

49.  Provided Kiwia's mental and physical capacities following the accident, Kiwia's options for future employment are limited. Kiwia is unable to perform manual labor that requires heavy lifting or high dexterity. Kiwia is unable to perform jobs that require extensive writing or typing. Kiwia does not have an American high school degree or GED, and the evaluation provided by Plaintiff's vocational expert, Thomas Meunier, coupled with Kiwia's ESL test scores from Delgado Community College, indicate a low probability that Kiwia will be able to earn a GED or perform college-level work in the future.

50.  The Court credits the opinion of Meunier that Kiwia can return to work at a significantly reduced capacity performing light exertional work that does not require frequent fine manipulation of the hand. Examples of such a position include that of a hotel clerk, passenger driver, booth cashier, information clerk, or salesclerk. These positions range in hourly pay from $10 to $14 per hour.

51.  The Court rejects the opinion of Defendants' vocational expert, Nancy Favaloro, to the extent that her opinion relies upon Plaintiff earning a GED or college degree. The Court agrees with Favaloro's opinion to

13

the extent she opines that, given Plaintiff's current vocational profile, Plaintiff may hold a position ranging in hourly pay from $10 to $14 per hour.

52.   Regarding Kiwia's pre-trial lost wages, the Court was presented with the opinions of Dr. Kenneth J. Boudreaux and Dr. G. Randolph Rice. Dr. Rice calculated Kiwia's pre-trial salary using the hours actually worked by Kiwia, resulting in an annualized amount of $29,058.38. Dr. Boudreaux calculated Kiwia's pre-trial salary to be $25,298.44 and based this calculation on a salary of $11.24 per hour with 2.25 hours of overtime, 40 hours of straight time 50 weeks per year and two weeks of straight time pay with no overtime. After reviewing Kiwia's personnel records, however, the Court finds no basis for Dr. Boudreaux's formula and adopts Dr. Rice's annualized wage. Per Dr. Rice's report, the Court finds that Kiwia has suffered a past after-tax wage loss of $54,010.00.

53.   At the time of trial, Kiwia had still not returned to work. Although Kiwia testified that his injury prevented him from returning to work as a hotel clerk, this Court was not presented with testimony or evidence suggesting that Kiwia was precluded from pursuing alternate forms of employment. Indeed, Dr. Tuggle testified that Kiwia could have begun performing light work in early 2020. The Court, however, was also presented with testimony as to Kiwia's chronic pain, need for a new prosthetic, PTSD, and emotional insecurity—all symptoms that have gradually improved with time. Considering the relevant evidence, the Court finds that Kiwia could have begun working in some limited capacity in early 2020 and that his failure to do so warrants a reduction in his past wage loss by 15%.

Accordingly, Kiwia's past wage loss award is reduced by 15% to $45,908.50.

54. Both Meunier and Favaloro opined that Kiwia can continue to make at least what he was making prior to the accident. Considering Kiwia's learning abilities and age, the Court does not find that Kiwia's earning ability is altered by his injuries. Accordingly, the Court does not find that a future wage loss award is warranted.

55. Given Kiwia's age of 43 and his educational background, Kiwia has a work-life expectancy of 17.95 years.

56. Although the Court finds that Kiwia will likely require future medical treatment in the form of occupational and psychological therapy, the Court was not offered any evidence as to the cost of such hypothetical future treatment. Accordingly, the Court finds that no award of future medical expenses is warranted.

57. The total cost of Kiwia's medical treatment with Dr. Howze, which was not paid by the Employer/Carrier under the LHWCA, is $12,634.

58. Intervenor American Longshore issued a Member's Coverage Agreement for worker's compensations coverage to Coastal Cargo which was in effect on March 1, 2019. Kiwia, as an employee of Coastal Cargo, was at all times covered by the LHWCA.

59. To date, American Longshore has paid indemnity and medical benefits to or on behalf of Faustine Kiwia in the amount of $108,365.65 pursuant to the LHWCA. This includes medical benefits totaling approximately $68,330.51, and the remainder paid to Kiwia in his bi-weekly indemnity benefits.

## CONCLUSIONS OF LAW

60. At the time of the accident, Kiwia was a longshoreman, and his claims against Defendants fall under 33 U.S.C. § 905(b) of the LHWCA.

61. Under § 905(b), an injured worker may bring a claim against a vessel owner for vessel negligence.

62. In *Scindia Stream Navigation Co. v. De Los Santos*, the Supreme Court held that a vessel owner owes three duties to a longshoreman: (1) the duty to turn over a reasonably safe vessel, (2) the duty to protect against hazards if the vessel is left in the owner's active control, and (3) the duty to intervene to prevent use of an unsafe practice if the vessel owner is aware that it is being undertaken. 451 U.S. 156, 167–78 (1981). The *Scindia* Court also held that the vessel owner has the duty to exercise due care under the circumstances. *Id.* at 166–67. Of the three *Scindia* duties, only the duty to intervene and the active control duty have potential applicability to this matter as the relevant areas of the Oslo Bulk were not turned over to Coastal Cargo.

63. Under the duty to intervene, a vessel owner must intervene in the contractor's operations if it has actual knowledge of a danger that it anticipates the contractor cannot or will not correct. *Id.* at 178. "[T]he longshoreman must show that the shipowner: 1) had actual knowledge that the defect posed unreasonable risk of harm; and 2) actual knowledge that it could not rely on the stevedore to protect its employees." *Moore v. M/V ANGELA*, 353 F.3d 376, 391 (5th Cir. 2003) (citing *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1248 (5th Cir. 1997)). As there is no evidence that any member of the Oslo Bulk's crew had actual knowledge of the fact that Coastal Cargo

crewmembers frequently placed their hands on the track of the hatch coaming, the Court finds that Defendants did not breach the duty to intervene.

64.   "[A] vessel owner may be liable under *Scindia's* active control duty if it actively involves itself in cargo operations *or* fails to protect contractors from hazards in areas under the active control of the vessel." *Fontenot v. McCall's Boat Rentals, Inc.*, 227 F. App'x 397, 403 (5th Cir. 2007) (emphasis in original). This duty includes the duty to avoid exposing longshoreman to harm "from hazards they may encounter . . . from equipment[] under the active control of the vessel during the stevedoring operation.'" *Id.* (quoting *Scindia*, 451 U.S. at 167) (internal quotations omitted). "This duty recognizes that although a vessel owner no longer retains *the primary responsibility* for safety in a work area turned over to an independent contractor, no such cession results as relates to areas or equipment over which the vessel's crew *retains operational control*." *Id.* at 403–04 (quoting *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997)).

65.   "To determine whether an area is in the active control of the vessel owner, [the Fifth Circuit] generally considers whether the area in question is within the contractor's work area and whether the work has been 'turned over' to the contractor." *Id.* (and cases cited therein). "[T]he vessel owner is not relieved of responsibility for conditions arising outside the area assigned to the stevedore." *Turner v. Costa Line Cargo Servs., Inc.*, 744 F.2d 505, 508 (5th Cir. 1984) (citing *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir. 1983)).

66.   It is undisputed that the cargo hatch coaming and its cover were at all relevant times within the sole active control of the Oslo Bulk's crew and not in an area turned over to Coastal Cargo.

67.   The Court finds the Defendants breached the *Scindia* active control duty through the Oslo Bulk's failure to warn the Coastal Cargo crew that the hatch cover was to be closed. The Court also finds that the active control duty was breached by the Oslo Bulk crewmember's failure to exercise "situational awareness" and survey the vicinity of the hatch coaming before closing the hatch cover.

68.   Defendants' breach of the *Scindia* active control duty was a primary cause of Plaintiff's injuries.

69.   Defendants are 50% at fault for Plaintiff's injuries.

70.   The Court rejects Defendants' contention that the active control duty is inapplicable because the vessel owner did not have control over the "actual methods" of the stevedore's work. As this Court has already held, the active control duty applies even in the absence of evidence of the vessel owner's "actual control" where the vessel owner was in sole control of the hazardous area or equipment. *See Landry v. G.C. Constructors,* 514 F. App'x 432, 435 (5th Cir. 2013) ("[E]ven where the vessel [owner] does not actively involve itself in the stevedoring operations, it may be liable if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the *active control of the vessel* during the stevedoring operation." (citations and quotation marks omitted)). *See, e.g., Turner*, 744 F.2d at 509 ("Turner was required to venture outside the area of normal and routine cargo operations to areas within the ship's control and was forced to cross the oil slick in a

location outside of his work area."); *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535 (5th Cir. 1986) (affirming the district court's finding that the vessel owner was negligent where the longshoreman slipped and fell in an area under the control of the vessel owner and the vessel owner retained the obligation to clean the deck); *Davis v. Estis Well Serv., L.L.C.*, 183 F. App'x 461 (5th Cir. 2006) (finding vessel owner's failure to safely position the vessel constituted a breach of the active control duty).

71. Under the LHWCA, Coastal Cargo had a statutory obligation to provide the longshoremen in its employ, such as Plaintiff, with a reasonably safe place of employment and to furnish equipment reasonably necessary to protect the safety of those workers. *See* 33 U.S.C. § 941. The Court finds that Coastal Cargo breached this obligation when it failed to adequately train Plaintiff and warn him of the hazard posed by the cargo hatch cover.

72. Coastal Cargo is 50% at fault for Kiwia's injuries.

73. Although Coastal Cargo is assessed fault for its training of Plaintiff, Defendants' liability for Plaintiff's damages is not and will not be reduced by any share of fault on the part of Coastal Cargo. Under general maritime law, the rule of joint and several liability still applies, and Defendants' liability for Plaintiff's damages includes not only its liability, but also that of Coastal Cargo. *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113 (5th Cir. 1995); *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979). As Defendants' liability for Plaintiff's damages caused and contributed to Kiwia's injuries and damages, they are responsible for the totality of damages suffered by Kiwia.

74. Kiwia was an inexperienced longshoreman at the time of his injury, and his testimony revealed that he was unfamiliar with the general operations of vessels. However, any lack of knowledge or unfamiliarity he had with the operations may be attributed to his employer for failing to advise of those general dangers.

## DAMAGES

75. "[I]n actions brought under § 905(b), an injured LHWCA covered employee may recover those items of damages which are recoverable under the general maritime law, including monetary recovery for past and future loss of earning capacity and wages, past and future medical expenses, and pain and suffering resulting from an injury caused by the defendant's negligence. *Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co.*, 324 F. Supp. 3d 808, 823 (E.D. La. 2018).

76. To determine lost future earnings, the Court must "estimat[e] the loss of work life resulting from the injury or death, calculat[e] the lost income stream, comput[e] the total damage, and discount[] that amount to its present value. [C]alculation of the lost income stream begins with the gross earnings of the injured party at the time of injury." *Mayne v. Omega Protein Inc.*, 370 F. App'x 510, 517 (5th Cir. 2010).

77. "The base figure used to calculate future wage loss is the difference between what a person could have earned 'but for' the accident and what he is able to earn upon returning to work in his partially disabled state." *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 899 (5th

Cir. 1989), *mandate recalled & modified on other grounds*, 934 F.2d 67 (5th Cir. 1991).

78. "Evidence about the likelihood that the earnings of an injured worker would increase due to personal merit, increased experience and other individual and societal factors" is admissible to show lost future earnings. *Culver v. Slater Boat Co.*, 722 F.2d 114, 122 (5th Cir. 1983).

79. Both Meunier and Favaloro opined that Kiwia can continue to make at least what he was making prior to the accident. Additionally, considering Kiwia's age and learning abilities, the Court finds it unlikely that Kiwia's future earning ability is substantially altered by his injuries. Accordingly, Kiwia is not entitled to a future wage loss award.

80. General damages are available "for pain and suffering and impact on one's normal life routines." *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 473 (5th Cir. 2015). General damages may also include an award for the permanent disfigurement caused to a plaintiff as a result of the injury. *Rushing v. U.S.*, 1997 WL 800822 (E.D. La. 1997).

81. In calculating Plaintiff's general damages, this Court considered the similar injuries sustained by the plaintiff in *Robertson v. Superior PMI, Inc.*, 600 F. Supp. 790 (W.D. La. 1985), *aff'd as modified*, 791 F.2d 402 (5th Cir. 1986). The court in *Robertson* awarded the plaintiff $400,000 in general damages where the plaintiff lost four fingers from his dominant hand in a workplace accident. *Id.* at 793–94. The award included past and future pain and suffering, permanent disability, disfigurement, mental anguish and embarrassment. *Id.* at 797. This

Court's general damages award utilizes the $400,000 figure from *Robertson* and adjusts for inflation.[1]

82. In most cases, including those in admiralty, "the traditional rule is . . . that an injured party must mitigate damages." *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 490 (5th Cir. 1985*); Blaauw v. Superior Offshore Int'l, LLC*, No. CIV. 06-1380, 2008 WL 4224808, at *15 (W.D. La. Sept. 10, 2008) ("The traditional rule that an injured party must mitigate damages is applicable under the Jones Act and general maritime law." (citing *Williams*, 750 F.2d at 490)). Here, the Court finds that Kiwia failed to mitigate his damages by failing to seek reasonable employment in the year preceding trial and that his past wage loss award should accordingly be reduced by 15%. *See Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co.*, 324 F. Supp. 3d 808, 829 (E.D. La. 2018) (finding that it was reasonable for the longshoreman to not attempt to find other work prior to trial and declining to reduce his past lost wage award).

83. "A plaintiff must prove some degree of certainty that future medical expenses would be incurred." *Howell v. Gould, Inc.*, 800 F.2d 482, 488 n. 3 (5th Cir. 1986) (citing *Martinez v. U.S. Fidelity & Guaranty Co.*, 423 So.2d 1088, 1092 (La. 1982); *Mathews v. Hanover Ins. Co.*, 428 So.2d 1273 (La. App. 3 Cir. 1983)). As Kiwia has not provided evidence as to the cost of his anticipated future medical expenses, the Court does not award Kiwia with such.

---

[1] The Court utilized the Consumer Price Index Inflation Calculator published by the United States Bureau of Labor Statistics. *See CPI Inflation Calculator*, U.S. BUREAU OF LABOR STATISTICS, https://www.bls.gov/data/inflation_calculator.htm (last visited May 23, 2021). A $400,000 award in January of 1985 is equivalent to a $1,004,272.99 award in March of 2021. *See id.*

84.   "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986) (citations omitted). In the Fifth Circuit, "prejudgment interest is ordinarily awarded from the date of loss." *See id.* (citations omitted). District courts have broad discretion in setting prejudgment interest awards and "may look to state law or other reasonable guideposts indicating a fair level of compensation." *See Todd Shipyards Corp. v. Auto Transp., S.A.,* 763 F.2d 745, 753 (5th Cir. 1985) (citations omitted). Here, the Court awards prejudgment interest at a rate of 1% from the date of Plaintiff's injury.

85.   Plaintiff is entitled to damages in the following amounts:

|  |  |
|---|---|
| Past medical expenses: | $80,964.50 |
| Past lost wages: | $45,908.50 |
| General Damages: | $950,000.00 |
| Total: | $1,076,873.00 |

## CONCLUSION

For the foregoing reasons, Plaintiff is entitled to judgment against Defendants on his claim in the amount of $1,076,873.00.

New Orleans, Louisiana this 24th day of May, 2021.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**